**ABN AMRO BANK N.V., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 91–1559C.**

United States Court of Federal Claims.

Sept. 11, 1995.

Stephen B. Gillman, Miami, Florida, for plaintiff. Alan I. Mishael, of counsel.

James W. Poirier, with whom were Assistant Attorney General Frank W. Hunger and David M. Cohen, Director, Washington, D.C., for defendant. Paul M. Curran, United States Department of the Treasury, of counsel.

## OPINION

ANDEWELT, Judge.

### I.

In this action, plaintiff, ABN Amro Bank, N.V., seeks to recover $1,653,753 from the United States Department of the Treasury (Treasury) for damages plaintiff suffered as a result of Treasury's alleged unauthorized reversal of a credit Treasury previously granted on a check presented to Treasury for payment. In the spring of 1990, an individual who purported to be a representative of Red Apple Supermarkets, Inc. (Red Apple), deposited a check for $1,653,753, made payable to Red Apple, in an account opened in Red Apple's name at plaintiff's Curacao branch. The check resembled a Treasury check and appeared to contain a valid drawer signature. Plaintiff credited Red Apple's account in the amount of the check and delivered the check to another bank, Sun Bank, for collection through the Federal Reserve System. Sun Bank in turn credited plaintiff's account in the amount of the check and forwarded the check to the Federal Reserve Bank of Atlanta (Federal Reserve) for collection. The Federal Reserve credited Sun Bank's account and debited Treasury's account in the amount of the check. Approximately seven months later, after determining that the check was counterfeit and not a true Treasury check, Treasury sent a notice to Sun Bank and reversed the previous credit to Sun Bank's account. Sun Bank in turn debited plaintiff's account but plaintiff could not debit Red Apple's account because Red Apple had previously depleted its account. On June 9, 1992, after unsuccessfully seeking a reversal of Treasury's action and restoration of the credit to plaintiff's account in the amount of the check, plaintiff filed the instant suit.

In its complaint, plaintiff presents a series of allegations. *Inter alia*, plaintiff contends that (1) Treasury's reversal of the credit previously granted on the check constitutes an illegal exaction of funds by Treasury in violation of Treasury regulations covering reclamation of funds mistakenly paid on Treasury checks, 31 C.F.R. § 240.6(a); (2) Treasury's delay of seven months before classifying the check as a forgery exceeds the "reasonable time" allowed under Treasury regulations for examining checks presented for payment, 31 C.F.R. § 240.3(c); (3) Treasury's reversal of the credit did not comply with the procedures described in Treasury regulations for reclaiming amounts improperly paid by Treasury, 31 C.F.R. § 240.7; and (4) Treasury's actions violated plaintiff's rights under both the due process and takings provisions of the Fifth Amendment to the United States Constitution. In its answer to the complaint, defendant asserts affirmative defenses, contingent counterclaims, and recoupment claims, the substance of which the court will discuss *infra*. This action is presently before the court on plain-

tiff's motion to strike defendant's affirmative defenses, counterclaims, and recoupment claims. For the reasons set forth below, plaintiff's motion to strike is granted in part and denied in part.

## II.

Plaintiff's motion to strike raises issues concerning the proper interpretation of the Treasury regulations contained in 31 C.F.R. pt. 240. Before turning to the text of these regulations, it is appropriate first to review certain basic banking concepts and to review the common law as it existed prior to Treasury's adoption of these regulations.

Every check has two sides. The front side contains a space for the name of the "payee," *i.e.*, the entity to whom the check is written, spaces for the numerical and written value of the check, a space for the signature of the "drawer" of the check, *i.e.*, the entity by whom the check is written, and the identity of the "drawee," *i.e.*, the entity upon whom an order for the payment of money is drawn, typically the bank at which the drawer has an account. The back side of the check contains a blank area for an indorsement by the payee and any subsequent holders of the check. An indorsement is required to effectuate the valid transfer of funds from the drawer's account to the payee.

Indorsed checks initially are submitted for deposit with a depositary bank. The depositary bank credits the amount shown on the face of the check to the proper account and then passes the check through appropriate channels to the drawee bank. The drawee bank then debits the drawer's account by the amount shown on the face of the check and credits the account of the depositary bank or any intermediary bank by that same amount. In this case, Treasury is the drawee bank and plaintiff is the depositary bank.

Forgeries can occur on either side of a check. On the front, a check may contain a forged drawer signature and on the back, a check may contain a forged indorsement. For the purpose of the instant motion to strike, the parties agree that the instant check constitutes a "double forgery" in that it contains both a forged drawer signature (the check purported to be signed by an Army representative but was not) and a forged indorsement (the check purported to be indorsed by a representative of Red Apple but was not).

## III.

Long ago, courts began to address the issue of the appropriate allocation of loss with respect to payments made on checks bearing forgeries. In 1762, in *Price v. Neal*, 97 Eng.Rep. 871, 3 Burr. 1354 (1762), the English courts addressed the issue of apportionment of loss with respect to checks bearing solely forged drawer signatures. *Price* involved two bills of exchange which the drawee bank paid despite the forged drawer signatures. When the drawee bank discovered the forgeries, it filed suit against the party that had originally accepted the check and that the drawee bank in turn had paid. The court denied any recovery on the ground that the drawee bank was in the best position to detect the forgery because the authorized drawers of the bills had accounts with the drawee bank and thus, the drawee bank had reason to know the handwriting of the authorized drawers. The reasoning and holding of *Price* were subsequently adopted as part of the United States federal common law. *See Bank of the United States v. Bank of Georgia*, 23 U.S. (10 Wheat.) 333, 348–50, 6 L.Ed. 334 (1819); *see also United States v. Chase Nat'l Bank*, 252 U.S. 485, 40 S.Ct. 361, 64 L.Ed. 675 (1920); *Hoffman & Co. v. Bank of Milwaukee*, 79 U.S. (12 Wall.) 181, 192–93, 20 L.Ed. 366 (1871). *Bank of Georgia* involved fraudulently altered bank notes mistakenly honored by the bank that originally issued the notes. Rejecting the bank's attempt to recover the sum it had mistakenly paid on the forged notes, the Supreme Court reasoned:

> [T]he receipt by a bank of forged notes, purporting to be its own, must be deemed an adoption of them. It has the means of knowing if they are genuine; if these means are not employed, it is certainly evidence of a neglect of that duty which the public have a right to require. And in respect to persons equally innocent, where one is bound to know and act upon his knowledge, and the other has no means of

knowledge, there seems to be no reason for burdening the latter with any loss in exoneration of the former.

23 U.S. (10 Wheat.) at 343–44. The Court further explained that "[t]he case of *Neal v. Price* has never since been departed from; and, in all the subsequent decisions in which it has been cited, it has had the uniform support of the court, and has been deemed a satisfactory authority." *Id.* at 350.

The rule of *Price* also has been adopted as part of the Uniform Commercial Code (U.C.C.), § 3–418 cmt. 1.[1] Hence, in those states that have adopted the applicable provision of the U.C.C., the rule of *Price* controls the allocation of loss with respect to forged drawer signatures. Comment 1 of Section 3–418 explains the advantage that the *Price* rule brings in terms of greater certainty in the banking process, as follows:

> The traditional justification for the result [of *Price* ] is that the drawee is in a superior position to detect a forgery because he has the maker's signature and is expected to know and compare it; a less fictional rationalization is that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered.

*Id.; see also Perini Corp. v. First Nat'l Bank,* 553 F.2d 398, 405 (5th Cir.1977) ("Reaffirming *Price v. Neal* in the final payment rule of § 3–418, the [U.C.C.] drafters recognized that the case's appraisal of relative opportunity to scrutinize drawer signatures was somewhat unrealistic [but] they nevertheless insisted that its conclusion survives."). Thus, under *Price,* a drawee bank that honors a check containing solely a forged drawer signature cannot recover the payment from an innocent depositary bank because the drawee bank was in a better position than the depositary bank to detect the forged drawer's signature.

The common law evolved differently for checks involving solely forged indorsements.

In such cases, rather than placing responsibility for the loss with the drawee bank, the courts placed liability on the depositary bank. *See National Metro. Bank v. United States,* 323 U.S. 454, 458, 65 S.Ct. 354, 356, 89 L.Ed. 383 (1945) (recognizing the "general rule under which one who presents and collects a valid commercial instrument with a forged endorsement can be compelled to repay"). Although the allocation of loss for the two types of forgery cases is different, the reasoning that underlies the results is essentially the same. In *Price* and its progeny, the courts allocated the loss to the drawee bank because the drawee bank is in a better position than the depositary bank to detect a forgery of the drawer's signature. Analogously, for forged indorsements, the depositary bank typically is in a better position than the drawee bank to detect a forgery because the depositary bank is either familiar with the indorser's signature or in a position to secure proof of the indorser's identity. *Id.* at 458, 65 S.Ct. at 356.

In *Chase Nat'l Bank,* 252 U.S. 485, 40 S.Ct. 361, 64 L.Ed. 675 the question arose as to how to resolve these conflicting outcomes in situations when a check contains both a forged drawer signature and a forged indorsement. Therein, a bank accepted a Treasury check containing a forged drawer signature from an individual who had also forged the indorsement. The bank presented the check to Chase National Bank and Chase National Bank in turn presented the check to Treasury. After receiving payment from Treasury, Chase National Bank credited the bank's account in the amount stated on the check. Later, after detecting the forgery, Treasury sued to secure payment from Chase National Bank.

On the particular facts presented therein, the Supreme Court applied the rule of *Price* and held that Treasury could not recover on a check with a forged drawer's signature. *Id.* at 494–96, 40 S.Ct. at 362–63. The Court concluded, in effect, that the existence of a forged indorsement should not necessarily

---

**1.** The U.C.C. is not binding in the instant case because the U.C.C. has never been adopted as part of federal law, and therefore "will not apply to curtail the rights of the U.S. government on its

checks." Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks* ¶ 28.23, at 28–56 (7th ed. 1992).

absolve Treasury of its responsibility to recognize the forged drawer's signature. The Court explained that because *Price* and its progeny generally render the drawee bank liable where there is a forged drawer's signature, "[t]he forged indorsement puts [the drawee bank] in no worse position than [it] would occupy if [the indorsement] were genuine." *Id.* at 496, 40 S.Ct. at 363. Thus, at least on the facts presented therein, *Chase Nat'l Bank* extends the holding of *Price* to double forgeries and provides that the drawee bank cannot recover funds it paid to an innocent holder of the check.

## IV.

Certain of defendant's affirmative defenses, recoupment claims, and counterclaims rest on the theory that *Chase Nat'l Bank* no longer controls the allocation of loss for double forgeries of Treasury checks. Defendant argues instead that *Chase Nat'l Bank* has been supplanted by the Treasury regulations contained in 31 C.F.R. pt. 240 which place liability on the depositary bank rather than on Treasury for amounts Treasury paid on checks with double forgeries. Plaintiff bases its motion to strike, in part, on the contention that *Chase Nat'l Bank* remains controlling precedent for such double forgeries.

The scope of 31 C.F.R. pt. 240, entitled "Indorsement and Payment of Checks Drawn on the United States Treasury," is described as follows:

The regulations in this part prescribe the requirements for indorsement and the conditions for payment of checks drawn on the United States Treasury. These regulations also establish procedures for collection of amounts due the United States Treasury because of payments on checks bearing forged or other unauthorized in-

dorsements or other material defects or alterations.

31 C.F.R. § 240.1. Section 240.11 describes the requirements for a proper indorsement of a check by a payee and Section 240.5 provides that the bank presenting the check to Treasury for payment guarantees that any indorsement is genuine.[2] Section 240.6 articulates a depositary bank's obligation to refund to Treasury initial payments made on defective checks, as follows:

(a) If, after a check has been paid by Treasury, it is found to:

(1) Bear a forged or unauthorized indorsement; or

(2) Contain any other material defect or alteration which was not discovered upon first examination, then, upon demand by the Treasury in accordance with the procedures specified in § 240.7 of this part, the presenting bank or other indorser shall refund the amount of the check payment.

\* \* \* \* \* \*

(d) If the Treasury determines that a check has been paid over a forged or unauthorized indorsement, the Commissioner may reclaim the amount of the check from the presenting bank or any other indorser that breached its guarantee of indorsement prior to:

(1) The end of the one-year period beginning on the date of payment; or

(2) The expiration of the 180–day period beginning on the close of the period described in paragraph (d)(1) of this section if a timely claim under 31 U.S.C. 3702 is presented to the agency which authorized the issuance of the check.

Defendant presents two alternative arguments as to why these regulations modify the result in *Chase Nat'l Bank* for double forgeries.[3] Defendant's first argument focuses on

---

**2.** Section 240.5 provides:

The presenting bank and the indorsers of a check presented to the Treasury for payment are deemed to guarantee to the Treasury that all prior indorsements are genuine whether or not an express guaranty is placed on the check. When the first indorsement has been made by one other than the payee personally, the presenting bank and the indorsers are deemed to guarantee the Treasury, in addition to other

warranties, that the person who so indorsed had unqualified capacity and authority to indorse the check on behalf of the payee.

**3.** The parties agree that a counterfeit Treasury check mistakenly honored by a Federal Reserve bank, such as the check herein, constitutes a check "drawn on the United States Treasury" initially within the language of 31 C.F.R. § 240.1.

the alleged comprehensive nature of the regulations' treatment of forged indorsements. Defendant argues that the regulations comprehensively detail the respective rights and obligations of depositary banks and the United States regarding Treasury checks that bear a forged indorsement. Because all checks containing double forgeries bear forged indorsements, defendant argues, these checks fall within and must be evaluated pursuant to the comprehensive regulations governing forged indorsements. Under these regulations, the depositary bank guarantees that indorsements are genuine (Section 240.5) and Treasury can reclaim funds paid on a forged indorsement pursuant to Section 240.6. Defendant's alternative argument does not focus on the provisions in the regulations that control the treatment of checks containing forged indorsements. Rather, defendant focuses instead on Section 240.6(a)(2) which establishes reclamation procedures for checks with any "material defect." Defendant argues that a check with a forged drawer's signature is a check with a "material defect" and therefore, that Section 240.6 specifically establishes procedures for Treasury's reclamation of checks with forged drawer signatures.

## V.

As to defendant's first argument, upon initial reading, the pertinent Treasury regulations do appear fairly comprehensive. Section 240.1 provides that the regulations "prescribe the requirements for indorsement and the conditions for payment of checks drawn on the United States Treasury," and the sections that follow give considerable detail as to applicable practices and procedures with respect to forged indorsements. Indeed, in the absence of pre-existing federal common law, defendant's contention that the regulations apply to all cases that involve forged indorsements would seem quite reasonable. The problem for defendant, however, is that there is a pre-existing body of federal common law to the effect that although a forged indorsement alone generally results in liability for the depositary bank, a forged drawer signature on a Treasury check generally results in liability for Treasury

even when there is also a forged indorsement.

In *United States v. Texas,* 507 U.S. 1631, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), the Supreme Court articulated the standard for determining whether a common law rule has been superseded by a subsequent statute or regulation. *Texas* involved the issue of whether a federal statute had modified the existing common law regarding payments of prejudgment interest to the United States in contract cases. Explaining that there is a presumption favoring the retention of existing common law, the Court articulated the following standard to determine whether that presumption has been overcome:

Just as longstanding is the principle that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." In such cases, Congress does not write upon a clean slate. In order to abrogate a common law principle, the statute must "speak directly" to the question addressed by the common law.

[Appellant] argues that this presumption favoring retention of existing law is appropriate only with respect to state common law or federal maritime law. Although a different standard applies when analyzing the effect of federal legislation on state law, there is no support in our cases for the proposition that the presumption has no application to federal common law, or for a distinction between general federal common law and federal maritime law in this regard. We agree with [appellant] that Congress need not "affirmatively proscribe" the common law doctrine at issue. But as we stated in *Astoria, supra,* "courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'"

*Texas,* 507 U.S. at 534; 113 S.Ct. at 1634–35 (citations omitted).

In situations when Congress grants an agency the authority to enact regulations that overrule common law, the question of

whether the agency exercised that power through the adoption of a particular regulatory scheme should be evaluated under the same approach that the Court used in *Texas* for evaluating whether a congressional statute modified the common law.[4] Analyzing 31 C.F.R. pt. 240 in the context of this presumption favoring the retention of existing common law, this court concludes that the regulations contained therein do not "speak directly" to the question of double forgeries and the wording of the regulations does not make "evident" Treasury's purpose to modify the common law result of *Chase Nat'l Bank*.

Turning first to the wording of the regulations, 31 C.F.R. pt. 240 discusses forged indorsements in detail but never specifically refers to forged drawer signatures, double forgeries, or the ruling in *Chase Nat'l Bank*, and never indicates that the rules for forged indorsements apply to those checks that also contain a forged drawer signature. Next, searching beyond the wording of the regulations for Treasury's purpose, defendant has not pointed to any congressional statute indicating that Congress intended Treasury to adopt regulations that would modify the result of *Chase Nat'l Bank*, nor has defendant identified any pronouncements or explanations accompanying the issuance of the regulations that indicate that Treasury even considered the result of *Chase Nat'l Bank* when it adopted the regulations. The court therefore concludes that Treasury intended the regulations, in pertinent part, to codify the result in *National Metro. Bank* with respect to the treatment of checks bearing only a forged indorsement. The regulations not only fail affirmatively to proscribe the existing common law with respect to double forgeries, but also fail to make "evident" that, by specifying general rules applicable to forged indorsements, Treasury intended to modify existing Supreme Court precedent concerning the liability for checks containing both a forged drawer signature and a forged indorsement. In other words, the regulations do not make evident that Treasury

intended a depositary bank's "guarantee" of a genuine indorsement to control in the apportionment of loss between the depositary bank and Treasury when Treasury paid on a Treasury check containing a forged drawer signature.

## VI.

■ Defendant's alternative argument relies upon the statement in Section 240.6(a)(2) that Treasury can reclaim amounts paid on checks determined to "[c]ontain any other material defect or alteration which was not discovered upon first examination." Defendant argues that a forged drawer signature constitutes a "material defect or alteration" and therefore, Treasury may reclaim the funds paid on the instant forged check pursuant to Section 240.6(a)(2). Because Section 240.6(a)(2) squarely encompasses forged drawer signatures, defendant argues, the regulation "speaks directly" to the existing common law and evidences a purpose contrary to that law, and thereby is sufficient to overcome the *Texas* presumption in favor of retaining existing common law principles.

Defendant's second argument would result in even a more fundamental change than its first with respect to the apportionment of risk among banks handling Treasury checks. Not only would defendant's interpretation of Section 240.6(a)(2) overrule the result of *Chase Nat'l Bank*, but it also would supersede the rule of *Price*, a rule which the Supreme Court explained in *Bank of Georgia*, 23 U.S. (10 Wheat.) at 349–50, "has never since been departed from," and a rule which has been embodied in the U.C.C. § 3–418 cmt. 1. Defendant's interpretation would supersede the result in *Price* because it would generally leave depositary banks, rather than Treasury, liable for Treasury checks with forged drawer signatures. For such checks, even in the absence of a forged indorsement, the responsibility for the loss would generally be placed on the depositary bank notwithstanding the fact that Treasury was the drawee on the check and seemingly

---

4. *Texas* specifically deals with the ability of a federal statute to abrogate existing federal common law. Because properly promulgated substantive federal regulations have the force of federal law, *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979), the approach employed in *Texas* is equally applicable to a question of whether a set of federal regulations has superseded a rule of federal common law.

in a far superior position than the depositary bank to identify a forged drawer signature. In addition, defendant's interpretation would undermine the benefits of *Price* noted in U.C.C. § 3–418 cmt. 1. Because it would permit Treasury, after a delay, to reopen and upset a series of prior bank transactions, defendant's interpretation would create additional indefiniteness in the banking system as to liability.

Given the long-standing viability of the rule of *Price* and the strong equitable and economic reasons that appear to support its continued application, it would be expected that had Treasury intended to adopt regulations that would modify *Price* and significantly change the apportionment of risk between Treasury and depositary banks, Treasury would have made that intention evident. Treasury, however, made no announcement relating to the *Price* rule and defendant has not submitted any evidence beyond the wording of the regulations to suggest such a purpose.

Turning to the wording of the regulations, the regulations are not without ambiguity. Section 240.2 contains several definitions of words and phrases used throughout Part 240, but it contains no definition of the phrase "other material defect or alteration." This phrase is broad in scope in that it refers to "*any* ... material defect" (emphasis added), but it is not apparent from this broad language whether "material defect" is a term of art encompassing forged drawer signatures or whether Treasury chose this wording for the purpose of modifying the existing common law pertaining to forged checks.

The most revealing evidence of Treasury's intentions in using the phrase "any other material defect or alteration" is found in the Treasury regulations that preceded Part 240. The earliest reference in Treasury regulations to material defects apparently was in 1935 in 31 C.F.R. § 202.34 (1935), and that regulation did not treat checks with forged drawer signatures as checks with material defects. Section 202.34 described Treasury's right to recover funds mistakenly paid on fraudulent checks as follows:

(b) In the event that *any check* or warrant which has been paid by the Treasurer is subsequently *found to bear a forged indorsement,* or to bear any other material alteration or defect which was not discovered upon first examination, a photographic copy of the check or warrant will be forwarded to the remitting bank and *[the remitting bank's] transit account will be charged with the amount by the Treasurer....*

(c) In cases of *checks* or warrants raised or *bearing a forged signature of the drawer,* not discovered upon first examination by the Treasurer, and in other cases *where the Treasurer's right to reclaim is in question,* the checks or warrants will be forwarded to the remitting bank as collection items and taken up by the Treasurer when credited, with *no intermediate charge in the account of the remitting bank.*

(Emphasis added.) Thus, under Section 202.34(b), for checks with a "forged indorsement, or ... any other material alteration or defect," there was no question that Treasury could reclaim the amount paid and could charge the account of the bank that had remitted the check to Treasury. For checks bearing a "forged signature of the drawer," however, Section 202.34(c) left Treasury's right of reclamation "in question," and Treasury could not intermediately charge the account of the remitting bank. Because the 1935 regulations treated a check with a forged drawer signature differently from a check containing "any ... material alteration or defect," it follows that at that time Treasury did not consider a check with a forged drawer signature to be a check with a material alteration or defect.

Treasury made numerous changes to the pertinent regulations in 1967. Treasury's reclamation rights were described in 31 C.F.R. § 360.5 (1968) which provides, in pertinent part:

The Treasurer shall have the right to demand refund from the presenting bank of the amount of a paid check if after payment the check is found to bear a forged or unauthorized indorsement ... or to contain any other material defect or alteration which was not discovered upon first examination.

Thus, in defining Treasury's reclamation rights, Section 360.5 essentially restates the provisions of 31 C.F.R. § 202.34(b) (1935), which covers checks with material defects, but eliminates the distinct description of the treatment of checks with forged drawer signatures formerly covered in 31 C.F.R. § 202.34(c) (1935). In this regard, 31 C.F.R. § 360.5 (1968) is generally consistent with the current scope of Treasury's reclamation rights contained in 31 C.F.R. § 240.6 (1994).

Defendant argues that Treasury's 1967 modifications to its prior regulations reflect a major change in the relationship between Treasury and the Federal Reserve System. According to defendant, as a part of this major change, Treasury eliminated the specific reference to checks with forged drawer signatures contained in 31 C.F.R. § 202.34(c) (1935) with the intent that such checks thereafter be treated as checks with material defects under the new Section 360.5. Such an intent, however, is far from apparent. Neither the language of the 1968 regulations nor the accompanying Federal Register materials indicate that Treasury intended to expand the phrase "other material ... defect" beyond its technical meaning in prior Treasury regulations so as to include forged drawer signatures. See 32 Fed.Reg. 14,217 (Oct. 13, 1967). In the absence of a clear indication to the contrary by Treasury, the most logical interpretation of the 1968 regulations is that Treasury intended the words used therein to have the identical meaning as those same words used in the regulations that were being replaced. As explained above, that meaning does not encompass forged drawer signatures.

This interpretation of the 1968 regulations leaves open the question of what rules Treasury intended to apply with respect to forged drawer signatures after Treasury eliminated the regulation that specifically addressed checks containing such forgeries. The answer to this question is that Treasury intended the rules of the common law to apply. In this regard, 31 C.F.R. § 202.34(c) (1935), in pertinent part, did not materially depart from the common law with respect to forged drawer signatures and its elimination would not have any significant effect on that law. The statement in 31 C.F.R. § 202.34(c) (1935)

that Treasury's right to reclaim money paid on checks bearing a forged drawer signature was "in question" is fully consistent with the common law as articulated in *Price, Bank of Georgia,* and *Chase Nat'l Bank.* These cases do not hold that the allocation of loss for forged drawer signatures on Treasury checks is always on Treasury. Rather, in deciding how to allocate the loss, *Price, Bank of Georgia,* and *Chase Nat'l Bank* each refers, in one way or another, to the lack of fault or innocence of the party that initially accepted the forged instrument. *Price,* 97 Eng.Rep. at 872, 3 Burr. at 1357 ("there is no reason to throw off the loss from one innocent man upon another innocent man"); *Bank of Georgia,* 23 US. (10 Wheat.) at 341 ("[b]oth parties are equally innocent of the fraud"). In *Chase Nat'l Bank,* 252 U.S. at 494, 40 S.Ct. at 362–63, the Supreme Court summarized *Price* as follows:

> *Price* ... held that it is incumbent on the drawee to know the drawer's hand and if the former pay a draft upon the latter's forged name to an innocent holder not chargeable with fault there can be no recovery. "The plaintiff can not recover the money, unless it be against conscience in the defendant to retain it." [97 Eng.Rep. at 872, 3 Burr. at 1357.] "But it can never be thought unconscientious in the defendant, to retain this money, when he has once received it upon a bill of exchange indorsed to him for a fair and valuable consideration, which he had *bona fide* paid, without the least privity or suspicion of any forgery." [97 Eng.Rep. at 872, 3 Burr. at 1357.] And the doctrine so announced has been approved and adopted by this court.

Applying *Price* to the *Chase Nat'l Bank* facts, the Supreme Court then concluded that it was consistent with good conscience to place the loss on the drawee bank. The Court explained:

> In order to recover plaintiff must show that the defendant cannot retain the money with good conscience. Both are innocent of intentional fault. The drawee failed to detect the forged signature of the drawer. The forged indorsement puts him in no worse position than he would occupy

if that were genuine. He cannot be called upon to pay again and the collecting bank has not received the proceeds of an instrument to which another held a better title. The equities of the drawee who has paid are not superior to those of the innocent collecting bank who had full right to act upon the assumption that the former knew the drawer's signature or at least took the risk of a mistake concerning it.

252 U.S. at 495–96, 40 S.Ct. at 362–63. Because these decisions indicate that the allocation of loss for forged drawer signatures potentially could be different if the equities of the drawee were superior to those of the depositary bank, 31 C.F.R. § 202.34(c) (1935) correctly tracked the common law when it stated that Treasury's right to reclaim amounts paid on checks containing forged drawer signatures was "in question."

The conclusion that a forged drawer signature does not constitute a material defect or alteration which can support Treasury's reclamation of funds under 31 C.F.R. § 240.6 also appears to be consistent with a page from Treasury's "Check Payment and Reconciliation System Manual" which defendant submitted along with its supplemental brief. That page describes the computerized coding of Treasury's reclamation requests and includes the following numbered reasons for reclamation:

1. The name of the payee has been altered.
2. The amount has been altered from _____ to _____.
3. Claim submitted by payee/co-payee.
4. Unauthorized negotiation.
5. Payee died MM/DD/YY.
6. Forged endorsement established by investigation.
7. Blanks (written out reason).

This list does not include a forged drawer's signature as one of the grounds that supports reclamation.

Thus, for the reasons set forth above, defendant has not overcome the presumption articulated by the Supreme Court in *Texas* favoring the retention of existing common law, and defendant has failed to demonstrate that the Treasury regulations contained in 31 C.F.R. pt. 240 supersede the common law with respect to double forgeries. The court, therefore, will apply *Price,* as adopted by the Supreme Court in *Bank of Georgia* and *Chase Nat'l Bank* and their progeny, in assessing the loss for a Treasury check containing a double forgery.

## VII.

In its motion before the court, plaintiff seeks to strike all of defendant's affirmative defenses, recoupment claims, and contingent counterclaims. In those defenses, claims, and counterclaims, defendant presents a series of different theories with respect to why plaintiff should be held liable for the full amount of the counterfeit Treasury check in issue.

### A.

■ Many of defendant's theories raise allegations concerning plaintiff's fault in allowing the counterfeit check to reach Treasury. For example, defendant alleges that plaintiff failed to exercise reasonable care in opening an account for Red Apple based on false documents presented by an unauthorized individual, in accepting the counterfeit check despite obvious defects, and in generally acting negligently with respect to the check and Red Apple's account. Defendant also contends that plaintiff was at fault for impeding the government's investigation of the check by failing to cooperate with a secret service investigation.

As explained above, *Price, Bank of Georgia,* and *Chase Nat'l Bank* are each based on a consideration of comparative fault and an assessment of where "good conscience" would allocate the loss. Therefore, consistent with *Price, Bank of Georgia,* and *Chase Nat'l Bank,* this court will allow defendant to present evidence at trial concerning the extent of plaintiff's fault.

### B.

■ In addition, defendant rests an affirmative defense, a recoupment claim, and a contingent counterclaim on 18 U.S.C. § 492 and a related Treasury regulation, 31 C.F.R. § 403.1. Section 492 provides that "[a]ll

counterfeits of any ... obligations ... of the United States ... shall be forfeited to the United States." Section 403.1 extends "to all banks and banking institutions" the authority "to take possession of and deliver to the Treasury Department through the Secret Service all counterfeit obligations and other securities and coins of the United States or of any foreign government which shall be presented at their places of business."

Defendant contends that this statute and the related regulation effectively prevent plaintiff from claiming an enforceable property interest in a counterfeit obligation of the United States because counterfeit obligations are always subject to unconditional forfeiture. This statute and related regulation, however, relate exclusively to possession of the physical counterfeit item. Here, plaintiff long ago passed on possession of the counterfeit Treasury check, and the government presently possesses that check. Thus, there is no issue as to whether forfeiture is appropriate in this case. The issue in this case is the apportionment of loss. between a depositary bank and Treasury after both parties erroneously honored the counterfeit check. That issue simply is not addressed in 18 U.S.C. § 492 or 31 C.F.R. § 403.1. Rather, apportionment of loss is governed by the applicable Treasury regulations and common law. Here, for the reasons explained above, the common law as articulated in *Price, Bank of Georgia,* and *Chase Nat'l Bank* is controlling. Neither 18 U.S.C, § 492 nor 31 C.F.R. § 403.1 "speak directly" to double forgeries or make evident a congressional or regulatory purpose to overrule *Price* and its progeny and to change the common law as it relates to double forgeries. *See Texas,* 507 U.S. at 534–35, 113 S.Ct. at 1634–35. Therefore, plaintiff's motion to strike is granted as it relates to defendant's affirmative defense, recoupment claim, and contingent counterclaim that rest on 18 U.S.C. § 492 and 31 C.F.R. § 403.1.

### C.

Defendant seeks recoupment on the theory that defendant's reclamation of the amount of the counterfeit check was valid because defendant substantially complied with the recla-

mation procedures set forth in 31 C.F.R. pt. 240. But for the reasons explained above, defendant's entitlement to reclaim monies paid on checks containing double forgeries is governed by the common law as articulated in *Price, Bank of Georgia,* and *Chase Nat'l Bank,* and not by Treasury reclamation procedures set forth in 31 C.F.R. § 240.6. Plaintiff's motion to strike defendant's recoupment claim based on 31 C.F.R. § 240.6 is therefore granted.

### D.

■ Defendant also rests a contingent counterclaim on the theory that plaintiff breached its guarantee of prior indorsements pursuant to 31 C.F.R. § 240.5. As explained above, that guarantee does not control in situations when a check contains a forged drawer's signature in addition to a forged indorsement. Therefore, plaintiff's motion to strike defendant's contingent counterclaim based on 31 C.F.R. § 240.5 is granted.

### E.

■ Defendant presents an affirmative defense that plaintiff has failed to state a claim upon which relief may be granted. Plaintiff alleges that defendant exacted funds from plaintiff based on a misapplication of Treasury regulations. This court has jurisdiction over such a claim of illegal exaction. *See Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967) (the Tucker Act grants the Court of Federal Claims jurisdiction over a claim that "money or property has been ... exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation"). Plaintiff's motion to strike defendant's affirmative defense of failure to state a claim is therefore granted.

### F.

Plaintiff challenges the sufficiency of defendant's recoupment claims and contends that defendant's contingent counterclaims fail to satisfy the pertinent statute of limitations. Pursuant to the court's decisions *supra,* however, the only remaining recoupment claims and contingent counterclaims are those that rest on the same factual allegations regard-

ing plaintiff's negligence and fault that underlie defendant's affirmative defenses. Because these affirmative defenses remain before the court for resolution at trial, it is not apparent that addressing plaintiff's challenge to defendant's remaining recoupment claims and counterclaims at this time would remove any significant issues from the case. Hence, the court will address these remaining challenges, if necessary, in a subsequent opinion.

*Conclusion*

For the reasons set forth above, plaintiff's motion to strike is granted as it relates to (1) defendant's affirmative defense, recoupment claim, and contingent counterclaim that rest on 18 U.S.C. § 492 and 31 C.F.R. § 403.1; (2) defendant's contingent counterclaim that rests on 31 C.F.R. § 240.5; and (3) defendant's affirmative defense of failure to state a claim. Plaintiff's motion to strike is denied in all other respects.

On or before October 10, 1995, the parties shall file a status report, jointly or separately, proposing a date for the close of discovery.

IT IS SO ORDERED.