# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 9, 2011          Decided March 2, 2012

No. 11-5114

NOBLE ENERGY, INC.,
APPELLANT

v.

KENNETH LEE SALAZAR, SECRETARY, UNITED STATES
DEPARTMENT OF INTERIOR, AND UNITED STATES
DEPARTMENT OF THE INTERIOR,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-02013)

———

*Steven J. Rosenbaum* argued the cause for appellant. With
him on the briefs was *Elliott Schulder*.

*John Emad Arbab*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief was
*Elizabeth Ann Peterson*, Attorney.

Before: GRIFFITH, *Circuit Judge*, and WILLIAMS and
RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge*
RANDOLPH.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

RANDOLPH, *Senior Circuit Judge*: The Outer Continental Shelf Lands Act authorizes the Secretary of the Interior to sell and administer oil and gas leases on the submerged lands located between state coastal waters and the high seas. 43 U.S.C. §§ 1331(a), 1332, 1337(a). The Act also empowers the Secretary to promulgate rules and regulations governing those leases. *Id.* § 1334(a). At issue here are regulations obligating lessees to plug permanently and to abandon their oil wells.

On September 1, 1979, Noble Energy[1] acquired a lease to drill for, develop, and produce oil and natural gas on roughly six thousand acres of submerged lands off the coast of California. Pursuant to the lease, Noble drilled an exploratory oil well in 1985 – "Well 320-2" – and discovered oil and gas in commercially viable quantities. Before producing any oil or gas, Noble temporarily plugged and abandoned the well, a technique that seals the well but allows for re-entry after additional testing or exploration.[2] *See* 30 C.F.R. § 250.1721. Twenty-seven years later, Well 320-2 remains temporarily plugged and abandoned.

---

[1] For ease of reference, we refer to Noble Energy, Inc. and its commercial predecessors as "Noble Energy."

[2] In comparison, the permanent plugging and abandonment of a well requires, among other things, the following steps: placing a series of cement plugs in the borehole beneath the sea floor; removing both the wellhead – the pressure containing access point at the sea floor – and large portions of the well's piping; and totally clearing the well site. 30 C.F.R. §§ 250.1715, 250.1716.

During the intervening years, suspensions of Noble's lease were common. A suspension – issued either at the lessee's request, after agency approval, or at the Interior Department's directive – has two principal effects: (1) it extends the life of a lease, which typically has an initial term of five years; and (2) it defers the lessee's obligation to produce oil. 43 U.S.C. §§ 1334(a)(1), 1337(b)(2) & (5); 30 C.F.R. §§ 250.105, 250.169. Interior grants suspensions when, for example, a lessee needs additional time to develop its lease, to obtain transportation facilities, or to negotiate sales contracts. 30 C.F.R. §§ 250.174, 250.175. Absent a threat of immediate or irreparable harm, suspensions generally do not interfere with a lessee's ability to explore, develop, or prepare its lease for oil production.

Noble requested and received its last suspension in 1999. Two years into the suspension's four-year term, a federal district court in California set it aside. The court ruled that suspensions had to comply with the 1990 amendments to the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq*. Under those amendments, "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *Id*. § 1456(c)(1)(A); *see California ex rel. Cal. Coastal Comm'n v. Norton*, 150 F. Supp. 2d 1046, 1053, 1057 (N.D. Cal. 2001), *affirmed* 311 F.3d 1162, 1173 (9th Cir. 2002). Because Noble's suspension had not been assessed for consistency with California's coastal management plan, the court ordered it revoked.

For the first time, states and their coastal management programs obtained a degree of influence over the suspension process. This new-found influence arguably made it more difficult for lessees to acquire suspensions. It undoubtedly

interfered with ongoing leasehold activities – the government directed many lessees to cease operations pending a review of their prior suspension requests. Noble and other lessees sued in the Court of Federal Claims, alleging that application of the Coastal Zone Management Act to suspension requests constituted a material breach of their lease agreements. The Court of Federal Claims agreed; on appeal the Federal Circuit affirmed. *Amber Res. Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008) (affirming 68 Fed. Cl. 535 (2005) and 73 Fed. Cl. 738 (2006)). The courts concluded that the government's compliance with the California court order made the development of leased property more difficult and the pursuit of suspensions more burdensome. *Amber Res.*, 538 F.3d at 1373-74. Thus, the government had effectively "repudiated the lease agreements by putting into practice the new [court-mandated] rules applicable to the availability of requested suspensions." *Id.* at 1370.

The lessees received $1.1 billion in restitution damages and were discharged from all obligations arising from their lease agreements.[3] Noble's share of the recovery was roughly $1.2 million. Among its discharged contractual duties was the obligation to "remove all devices, works, and structures from the premises no longer subject to the lease."

This brings us to the current dispute: one year after the Federal Circuit's decision in the breach-of-contract litigation,

---

[3] Under the common law rule of discharge, one party's material breach of a contract will excuse the other party's performance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981); *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011); *3511 13th Street Tenants' Ass'n v. 3511 13th Street, N.W., Residences, LLC*, 922 A.2d 439, 445 (D.C. 2007); *see also Amber Res.*, 68 Fed. Cl. at 548-49.

the Minerals Management Service, at that time an arm of the Interior Department, sent a letter to Noble ordering it to plug and abandon Well 320-2 permanently. Because this controversy arises directly from that letter, we quote it at length:

> The purpose of this letter is to notify you of outstanding decommissioning obligations that exist on one of your OCS leases. Our records indicate that your Well OCS P-0320, No 2, has not been permanently abandoned. The Minerals Management Service (MMS) has determined that there is no longer justification for maintaining the well in temporarily abandoned status. Therefore, as required by 30 CFR 250.1723, you must: promptly and permanently plug the well according to 250.1715; clear the well site according to 250.1740 through 250.1742; and perform any additional activity necessary to fully satisfy your decommissioning obligations.

The total cost of such tasks is estimated at more than $20 million.

Noble responded to the order by explaining "that the Government's material breach discharged the lessees from any obligation to conduct, arrange or pay for the plugging and abandonment of the 320 # 2 exploratory well." Its letter to MMS also announced that Noble had sued the Secretary of the Interior and his agency for injunctive and declaratory relief. The suit alleged that the plug and abandon order was arbitrary, capricious, an abuse of discretion, and not in accord with the law. *See* 5 U.S.C. § 706(2)(A).

The district court first determined, correctly we believe, that it had jurisdiction over Noble's complaint.[4] *Noble Energy, Inc. v. Salazar*, 770 F. Supp. 2d 322, 328-29 (D.D.C. 2011). As to the merits, the court ruled that the common law doctrine of discharge did not relieve Noble of the regulatory obligation to plug its well permanently, an obligation that the lease did not itself create. *Id.* at 331-32. Our review is de novo. *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 4 (D.C. Cir. 2011).

Interior's regulations require that lessees "[p]romptly and permanently plug" their temporarily-abandoned oil wells if the government so orders. 30 C.F.R. § 250.1723. Lessees must in any event "permanently plug all wells on a lease within 1 year after the lease terminates." *Id.* § 250.1710; *see also id.* § 250.1703(b). As with other regulatory duties regarding the outer Continental Shelf, these obligations accrue the moment an entity drills a well or becomes a lessee, *id.* §§ 250.1701(a), 250.1702(a) & (d), and generally are discharged only when satisfied, *id.* § 250.1701(a). The obligations expressly survive

---

[4] Although Noble did not go through any formal process to relinquish its lease, *see* 30 C.F.R. § 556.76, the district court was "inclined" to agree that the government's material breach had the effect of terminating the lease as a matter of law. This placed Noble's lawsuit squarely within the provision of the Outer Continental Shelf Lands Act conferring jurisdiction on district courts over "controversies arising out of, or in connection with . . . the cancellation, suspension, or termination of a lease or permit under this [Act]." 43 U.S.C. § 1349(b)(1). Additionally, the court concluded that while the Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over claims for more than $10,000 founded on a contract with the United States, Noble's claim, which did not seek monetary relief, turned exclusively on whether MMS had authority to issue the plug and abandon order. The government has not renewed its jurisdictional objection on appeal.

assignment, *id*. § 556.62(d); transfer, *id*. § 556.64(a)(5); and termination of a lease, *id*. §§ 556.76, 250.1710.

Noble's argument against application of the regulations proceeds as follows.  The government materially breached its lease agreement when it applied the Coastal Zone Management Act to suspension requests.  Under the common law rule of discharge, Noble's remaining contractual obligations were therefore excused, including any contractual duties to plug and abandon Well 320-2.  Because federal regulations impose similar decommissioning obligations, and because those regulations exist to govern contractual relationships, the "common law rule of discharge applies to the regulatory plug and abandonment requirement[s]" as well.

The argument relies in large measure on *United States v. Texas*, 507 U.S. 529 (1993).  In that case, the Court held that (1) "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident," *id*. at 534 (quoting *Isbrandsten Co. v. Johnson*, 343 U.S. 779, 783 (1952)); and (2) "[i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law," *id*. (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)).  Noble thinks these holdings require common law principles of discharge to "be read into the OCS Lands Act and regulations."

The government's main counter-argument is that neither *United States v. Texas*, nor any of the other cases Noble invokes, holds that "at common law a breach of contract by the United States (or by a private party for that matter) discharges the non-breaching party from compliance with its independent statutory and regulatory obligations."

Resolution of this dispute depends on what the plugging regulations mean. If the regulations impose an obligation to plug Well 320-2 regardless of the government's breach of the lease contract, Noble's argument fails. If the regulations release the duty to plug once the government materially breaches the lease agreement, then Noble prevails. Nothing in § 250.1710, § 250.1723, or any of the agency's other regulations clearly addresses this question.

It is important to remember that we are considering these regulations in the context of judicial review of agency action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. The "agency action" here is MMS's order, or as the government calls it, MMS's "decision letter." Section 706 of the APA instructs reviewing courts to "determine the meaning or applicability of the terms of an agency action" when necessary. But with respect to the decision letter, we are unable to perform this duty with any confidence. We know that MMS issued the letter about a year after the Federal Circuit ruled that the government materially breached the lease. What we do not know is whether MMS actually decided that the regulatory obligation to plug Well 320-2 continued post-breach. There is not a word in MMS's letter indicating that it considered the common law doctrine of discharge. And even if the letter was the result of careful consideration regarding how the regulations operate in light of the *Amber* rulings, MMS's letter contains no hint of the agency's reasoning or the factors that it took into account. We therefore cannot be sure whether MMS's letter embodied an interpretation of the regulations' applicability after breach. One might infer this, but as we have said in a similar situation, "an implication is not an agency interpretation." *Menkes v. DHS*, 486 F.3d 1307, 1314 (D.C. Cir. 2007); *see also PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) ("Yes, DEA did exercise discretion when it issued the order here, but before doing so it necessarily had to decide what [the

provision] meant.  That is the issue the agency must reconsider on remand . . . so that it can fill in the [interpretative] gap" left unexplained.).  Remand therefore is necessary.

Our reluctance to speculate about how MMS interpreted its regulations follows from the principle laid down in a line of cases reaching back at least to *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985).  Those cases hold that on judicial review this court will not choose between competing meanings of an ambiguous law until the relevant agency weighs in.[5]  *Id.* at 948; *see also Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006); *Teva Pharm. USA, Inc. v. FDA*, 441 F.3d 1, 4 (D.C. Cir. 2006); *PDK Labs.*, 362 F.3d at 798; *Arizona v. Thompson*, 281 F.3d 248, 259 (D.C. Cir. 2002); *Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000); *Alarm Indus. Commc'ns Comm. v. FCC*, 131 F.3d 1066, 1072 (D.C. Cir. 1997).  Put simply, "an agency is entitled to construe its own regulations in the first instance." *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 742 (D.C. Cir. 1990) (per curiam).  If we cannot tell whether it has done so, remand is appropriate.  *See Menkes*, 486 F.3d at 1313-15; *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1302, 1304-05 (D.C. Cir. 2000); *Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 461 (D.C. Cir. 1989).  *Cf. Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. NLRB*, 46

---

[5] The actual holding of *Prill* and the cases following it is this: when an agency incorrectly concludes that Congress mandated a particular regulatory interpretation of a statute – and the agency therefore stops itself at *Chevron* step one – this court will vacate and remand.  Upon remand, the agency is required to bring its experience and expertise to bear in parsing the statute and implementing an appropriate regulatory response.  755 F.2d at 948.  While that holding does not apply here, the underlying principle, as explained in the text, clearly does.

F.3d 82, 93 (D.C. Cir. 1995); *Int'l Longshoremen's Ass'n, AFL-CIO v. Nat'l Mediation Bd.*, 870 F.2d 733, 735-36 (D.C. Cir. 1989).

We acknowledge that judicial deference to an agency's interpretation of its own regulation may be appropriate even though the interpretation appears for the first time in a legal brief. *See Auer v. Robbins*, 519 U.S. 452, 462 (1997) (giving deference to an interpretation contained in an amicus brief); *Drake v. FAA*, 291 F.3d 59, 68-69 (D.C. Cir. 2002) (adversarial brief). That said, we cannot find any definitive interpretation of the plug and abandon regulations in the government's brief. This may be attributable to the fact that MMS was abolished in May 2010 – more than a year before the government filed its brief in this proceeding. *Area Energy LLC v. Salazar*, 642 F.3d 212, 214 (D.C. Cir. 2011) (citing Sec'y of Interior, *Secretarial Order 3299* (May 19, 2010)). What we are left with is a brief written by the Department of Justice, defending the actions of a disbanded Interior Department office, without – as far as we can tell – any consideration of the regulations by MMS's successor. This is not the stuff of *Auer* deference.

In short, it is up to MMS's successor to interpret its regulations in the first instance and to determine whether they apply in situations like Noble's. If they do, the agency must explain why. *See Int'l Longshoremen's Ass'n*, 870 F.2d at 735-37. We therefore vacate the judgment and send the case back to the district court with instructions to vacate Interior's order and to remand to the Secretary for further proceedings consistent with this opinion.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring:  I concur in the court's opinion and judgment but write separately to express doubt whether the Interior Department, on remand, will be able to offer an interpretation that is both reasonable and supportive of its action here.

Noble has invoked the rule in *United States v. Texas*, 507 U.S. 529 (1993), which, as the court's opinion notes, creates a presumption "favoring the retention of long-established and familiar principles" of the common law, rebuttable by an evident statutory purpose to the contrary.  *Id*. at 534, quoted *ante* at 7.  The variant of that rule that Noble needs in order to win is very narrow:  that when the government behaves as a market actor, and promulgates statutes or regulations governing the relationship between it and private-sector market actors in a manner parallel to what in the private sector would be controlled by contract or the common law, the statutes or regulations are presumptively subject to the sort of implied caveats and qualifications that apply to comparable contract language or common law understandings.

The government ventured into oil-and-gas production as a rather standard market actor—a lessor of property potentially productive of oil or gas.  It promulgated regulations that exactly match the set of parties governed by its leases: itself and those lessees.  The regulations cover all such lessees— and no other private parties whatsoever.  30 C.F.R. § 250.1701.  The lease's text is short, only four pages, Joint Appendix ("J.A.") 82-85, shorter than many leases used in the private sector, and much shorter what might be expected of a private lease prepared by a lessor with anything like the government's "bargaining power."  See NANCY SAINT-PAUL, 5 SUMMERS OIL AND GAS § 59:10 (3d. ed. 2009).  The regulations plainly function as a supplement to the lease, and

the specific ones at issue here directly complement a lease provision. Section 22 of the lease, governing "Removal of Property on Termination of Lease," provides:

> Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

J.A. 85. The disputed regulations essentially repeat the terms of § 22 in more detail, providing when and how a lessee must decommission a well. See, e.g., 30 C.F.R. § 250.1710-1716; *id*. § 250.1725-1728. Using regulations to amplify the lease terms saves paper (though of course it may have other purposes).

As a market actor the government is subject to the normal common law rules of contract, unless a law "speak[s] directly to the question addressed by the common law." *Texas*, 507 U.S. at 534. The government argues that the regulations have no explicit provision that total breach by a party (here the government) has the effect of discharging the other party from its obligations. Quite true. Neither does the lease itself. Yet common law courts have found the principle implicit in contracts generally, presumably filling in what the parties would likely have specified had they addressed the issue. See PETER LINZER, 6 CORBIN ON CONTRACTS § 26.2.A. (Joseph M. Perillo ed., 2010) (in filling gaps "the court quite properly asks what the parties would have done if the issue had been raised when the contract was being negotiated."); see also

RESTATEMENT (SECOND) OF CONTRACTS § 204 cmt. d (1981). Of course the government had the authority to insist on a contract reversing the implication. The question posed by this case is whether it did so, silently. The *Texas* principle suggests a negative answer.

Of cases applying the *Texas* concept, two are very similar to this case: *ABN AMRO Bank v. United States*, 34 Fed. Cl. 126 (1995), and *Amoco Production v. Fry*, 904 F. Supp. 3 (D.D.C. 1995). In the first, an individual deposited a check purportedly issued by the federal government and payable to a supermarket chain. 34 Fed. Cl. at 127. The depository bank, ABN AMRO, accepted the check and presented it to the federal government for payment. *Id*. It turned out that the government had not issued the check and that the individual depositing the check was not in fact a representative of the supermarket chain. This combination made the case one of "double forgery." *Id*. at 128. ABN AMRO invoked the traditional common law rule in such cases, namely that the drawee bank, here the government, would be liable for the loss. The government claimed that its regulations superseded that rule. *Id*. at 130 n.2 (quoting 31 C.F.R. § 240.5). The court, while acknowledging that the regulations were "fairly comprehensive" and apparently accepting the government's argument that their literal language would abrogate the common law, nevertheless held that the regulations did not "make evident" an intent to displace the double forgery rule. *Id*. at 131, 132. It thus rejected the government's theory. *Id*.

*Amoco Production* applies similar reasoning to the Outer Continental Shelf Lands Act, the statute supporting the regulations here. Plaintiffs, oil and gas producers on offshore federal leases, paid royalties to the federal government on oil and gas they produced. 904 F. Supp. at 7. The oil and gas producers frequently overpaid, and the statute provided that in such a case, on lessee's request and after confirmation of such

excess by the Interior Secretary and a delay for congressional review, "'such excess shall be repaid without interest.'" *Id*. at 7 (quoting 43 U.S.C. § 1339(a)). Lessees could alternatively have the excess applied as a credit on future royalty payments. *Id*. An audit determined that the producers had in fact underpaid at some points in the past, and the Minerals Management Service ("MMS") ordered the producers to "pay royalties the audit determined to be due." *Id*. The producers refused, and the MMS responded by withholding written permission for the producers' overpayment credits. *Id*. at 7-8. In doing so the MMS invoked the general common law right of offset, "the right of a creditor to use money it owes to a debtor to satisfy the debt owed to it." *Id*. at 9. The court found that the statute's command that "excess [royalty payments] shall be repaid" expressed no intent to abrogate MMS's common law right of offset or to otherwise "invalidate[] the MMS's procedures." *Id*. at 9. The oil and gas producers appealed the district court decision but not its ruling that the MMS's common law offset right survived the statute. Brief for Appellants at 1-2, *Amoco Production v. Fry*, 118 F.3d 812 (D.C. Cir. 1997) (No. 96-5030).

In both *ABN AMRO* and *Amoco Production* positive law stated a general rule but did not address a specific eventuality for which the common law provided an exception. Both courts concluded that the statute or regulations in question, expressing no explicit intent to displace the common law exception, in fact had no such effect. It therefore prevailed against the statutory or regulatory language.

At oral argument we tried to extract from counsel the government's theory for distinguishing these two cases. Counsel responded that Noble had failed to identify a common law principle allowing "discharge from regulatory obligations." Oral Arg. at 28:30. This seems to mix two ideas, neither of them helpful to the government. Insofar as it

5

notes that neither *ABN AMRO* nor *Amoco* involved "discharge," it is a distinction but a pointless one; both involved the relation between the common law and a statute or regulation; the specific common law principle at issue seems unimportant. Insofar as the government's argument asks that the common law principle have an effect on a *regulation*, it offers no distinction at all. In both the cases the party invoking the common law made no claim that there was a common law principle directly applying to "regulatory obligations"; they argued simply that the regulations, despite their literal language, should be read in light of the common law principles that governed parallel transactions in the private sector. Here too the government was performing the kind of ordinary business transactions that a private party might have performed. Accordingly, the *Texas* case similarly calls for applying common law principles as an interpretive gloss on the parallel regulation's literal language. Noble acknowledges that Interior possessed legal authority to issue regulations displacing the common law; nothing in the current regulations seems to have exercised that authority.