WILLIAMS, Senior Circuit Judge,
concurring:
I concur in the court’s opinion and judgment but write separately to express doubt whether the Interior Department, on remand, will be able to offer an interpretation that is both reasonable and supportive of its action here.
*1247 Noble has invoked the rule in United States v. Texas, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), which, as the court’s opinion notes, creates a presumption “favoring the retention of long-established and familiar principles” of the common law, rebuttable by an evident statutory purpose to the contrary. Id. at 534, 113 S.Ct. 1631, quoted ante at 1245. The variant of that rule that Noble needs in order to win is very narrow: that when the government behaves as a market actor, and promulgates statutes or regulations governing the relationship between it and private-sector market actors in a manner parallel to what in the private sector would be controlled by contract or the common law, the statutes or regulations are presumptively subject to the sort of implied caveats and qualifications that apply to comparable contract language or common law understandings.
The government ventured into oil-and-gas production as a rather standard market actor—a lessor of property potentially productive of oil or gas. It promulgated regulations that exactly match the set of parties governed by its leases: itself and those lessees. The regulations cover all such lessees—and no other private parties whatsoever. 30 C.F.R. § 250.1701. The lease’s text is short, only four pages, Joint Appendix (“J.A.”) 82-85, shorter than many leases used in the private sector, and much shorter what might be expected of a private lease prepared by a lessor with anything like the government’s “bargaining power.” See Nancy Saint-Paul, 5 Summers Oil and Gas § 59:10 (3d. ed. 2009). The regulations plainly function as a supplement to the lease, and the specific ones at issue here directly complement a lease provision. Section 22 of the lease, governing “Removal of Property on Termination of Lease,” provides:
Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.
J.A. 85. The disputed regulations essentially repeat the terms of § 22 in more detail, providing when and how a lessee must decommission a well. See, e.g., 30 C.F.R. §§ 250.1710-1716; id. §§ 250.1725-1728. Using regulations to amplify the lease terms saves paper (though of course it may have other purposes).
As a market actor the government is subject to the normal common law rules of contract, unless a law “speak[s] directly to the question addressed by the common law.” Texas, 507 U.S. at 534, 113 S.Ct. 1631. The government argues that the regulations have no explicit provision that total breach by a party (here the government) has the effect of discharging the other party from its obligations. Quite true. Neither does the lease itself. Yet common law courts have found the principle implicit in contracts generally, presumably filling in what the parties would likely have specified had they addressed the issue. See Peter Linzer, 6 Corbin on Contracts § 26.2.A. (Joseph M. Perillo ed., 2010) (in filling gaps “the court quite properly asks what the parties would have done if the issue had been raised when the contract was being negotiated.”); see also Restatement (Second) of Contracts § 204 cmt. d (1981). Of course the government had the authority to insist on a contract reversing the implication. The question posed by this case is whether it did so, silently. The Texas principle suggests a negative answer.
*1248 Of cases applying the Texas concept, two are very similar to this case: ABN Amro Bank v. United States, 34 Fed.Cl. 126 (1995), and Amoco Production v. Fry, 904 F.Supp. 3 (D.D.C.1995). In the first, an individual deposited a check purportedly issued by the federal government and payable to a supermarket chain. 34 Fed. Cl. at 127. The depository bank, ABN AMRO, accepted the check and presented it to the federal government for payment. Id. It turned out that the government had not issued the check and that the individual depositing the check was not in fact a representative of the supermarket chain. This combination made the case one of “double forgery.” Id. at 128. ABN AMRO invoked the traditional common law rule in such cases, namely that the drawee bank, here the government, would be liable for the loss. The government claimed that its regulations superseded that rule. Id. at 130 n. 2 (quoting 31 C.F.R. § 240.5). The court, while acknowledging that the regulations were “fairly comprehensive” and apparently accepting the government’s argument that their literal language would abrogate the common law, nevertheless held that the regulations did not “make evident” an intent to displace the double forgery rule. Id. at 131, 132. It thus rejected the government’s theory. Id.
Amoco Production applies similar reasoning to the Outer Continental Shelf Lands Act, the statute supporting the regulations here. Plaintiffs, oil and gas producers on offshore federal leases, paid royalties to the federal government on oil and gas they produced. 904 F.Supp. at 7. The oil and gas producers frequently overpaid, and the statute provided that in such a case, on lessee’s request and after confirmation of such excess by the Interior Secretary and a delay for congressional review, “ ‘such excess shall be repaid without interest.’ ” Id. at 7 (quoting 43 U.S.C. § 1339(a)). Lessees could alternatively have the excess applied as a credit on future royalty payments. Id. An audit determined that the producers had in fact underpaid at some points in the past, and the Minerals Management Service (“MMS”) ordered the producers to “pay royalties the audit determined to be due.” Id. The producers refused, and the MMS responded by withholding written permission for the producers’ overpayment credits. Id. at 7-8. In doing so the MMS invoked the general common law right of offset, “the right of a creditor to use money it owes to a debtor to satisfy the debt owed to it.” Id. at 9. The court found that the statute’s command that “excess [royalty payments] shall be repaid” expressed no intent to abrogate MMS’s common law right of offset or to otherwise “invalidate! ] the MMS’s procedures.” Id. at 9. The oil and gas producers appealed the district court decision but not its ruling that the MMS’s common law offset right survived the statute. Brief for Appellants at 1-2, Amoco Production v. Fry, 118 F.3d 812 (D.C.Cir.1997).
In both ABN Amro and Amoco Production positive law stated a general rule but did not address a specific eventuality for which the common law provided an exception. Both courts concluded that the statute or regulations in question, expressing no explicit intent to displace the common law exception, in fact had no such effect. It therefore prevailed against the statutory or regulatory language.
At oral argument we tried to extract from counsel the government’s theory for distinguishing these two cases. Counsel responded that Noble had failed to identify a common law principle allowing “discharge from regulatory obligations.” Oral Arg. at 28:30. This seems to mix two ideas, neither of them helpful to the government. Insofar as it notes that neither *1249 ABN Amro nor Amoco involved “discharge,” it is a distinction but a pointless one; both involved the relation between the common law and a statute or regulation; the specific common law principle at issue seems unimportant. Insofar as the government’s argument asks that the common law principle have an effect on a regulation, it offers no distinction at all. In both the cases the party invoking the common law made no claim that there was a common law principle directly applying to “regulatory obligations”; they argued simply that the regulations, despite their literal language, should be read in light of the common law principles that governed parallel transactions in the private sector. Here too the government was performing the kind of ordinary business transactions that a private party might have performed. Accordingly, the Texas case similarly calls for applying common law principles as an interpretive gloss on the parallel regulation’s literal language. Noble acknowledges that Interior possessed legal authority to issue regulations displacing the common law; nothing in the current regulations seems to have exercised that authority.