**AMOCO PRODUCTION CO., et al., Plaintiffs,**

v.

**Thomas A. FRY, et al., Defendants.**

**Civ. A. No. 93–2163 (RCL).**

United States District Court, District of Columbia.

Oct. 12, 1995.

**6**

L. Poe Leggette, Jackson & Kelly, Washington, DC, for plaintiffs.

Michael Reed, U.S. Department of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, DC, for defendants.

Lisa K. Hemmer, Trial Attorney on Behalf of U.S. Department of Justice, Washington, DC.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on the parties' cross-motions for summary judgment. Upon consideration of the parties' submissions and the relevant law, for the reasons set forth below, the court will grant defendants' motion for summary judgment, and deny plaintiffs' motion for summary judgment.

### I.

### BACKGROUND

Plaintiffs in this case are oil companies[1] who pay monthly mineral royalties[2] to the federal government pursuant to various federal gas and oil leases.[3] Defendants are officials in the government agencies[4] that

---

**1.** Plaintiffs are (1) Amoco Production Company, (2) Marathon Oil Company, (3) Mobil Exploration & Producing U.S. Inc., (4) Phillips Petroleum Company, (5) Texaco Exploration and Production, Inc., (6) Texaco Trading and Transportation, Inc., and (7) Union Pacific Resources Company.

**2.** Under leasing statutes, lease terms, and regulations, lessees must pay royalties calculated as a specified percentage of the value of the production removed or sold from the lease. 43 U.S.C.A. § 1337(a)(1)(A) (1986 & West Supp.1995); 30 U.S.C.A. § 226 (1986 & West Supp.1995); 25 C.F.R. § 211.13 (tribal leases); and 25 C.F.R. § 212.16 (allotted leases).

**3.** The leases cover oil and gas located on federal onshore public domain and acquired lands, on

Indian tribal and allotted lands, and on the Outer Continental Shelf ("OCS"). The Department of the Interior issues OCS leases under the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331–56 (1986 & West Supp.1995), and administers leases on Indian allotted lands and Indian tribal lands under 25 U.S.C.A. § 396 (1983) and 25 U.S.C.A. § 396a–396g (1983 & West Supp.1995), respectively.

**4.** Named defendants are (1) Thomas A. Fry, Director, Minerals Management Service; (2) Bruce Babbitt, Secretary of the Interior; (3) Robert L. Armstrong, Assistant Secretary of the Interior; (4) James W. Shaw, Associate Director for Royalty Management; and (5) Donald Sant, Jr., Deputy Associate Director for Compliance.

administer the federal gas and oil leases, the primary agency being the Minerals Management Service ("MMS") of the Department of the Interior ("DOI").

For various reasons, plaintiffs often overpay their monthly royalty payments. Such overpayment is recoverable, however, if the payor files a timely request for credit or refund pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C.A. §§ 1331–56 (1986 & West Supp.1995) ("OCSLA").

A. *Section 10 of the OCSLA*

Section 10 of the OCSLA grants the Secretary of the DOI ("Secretary") authority to credit or refund OCSLA royalty overpayment when two conditions are met. First, it must appear "to the satisfaction of the Secretary" that the payor made a royalty overpayment "in excess of the amount he was lawfully required to pay." 43 U.S.C.A. § 1339(a). Second, Congress must be given an opportunity to review the proposed credit or refund. The Secretary must send a report to Congress regarding the amount of credit to be given to whom and a summary of the factual basis for the decision. "No refund of or credit for such excess payment shall be made until after the expiration of thirty days" from the time the Secretary reports to Congress.[5] *Id.* at § 1339(b).

Once the Congressional report-and-wait period expires, and "it appears to the satisfaction of the Secretary" that a lessee has overpaid an OCS royalty payment, "such excess shall be repaid without interest." *Id.* at 1339(a). If the lessee desires a refund, the Secretary certifies the amount of the repayment to the Secretary of the Treasury, who issues the refund. If the lessee desires a

credit toward future royalty payments, the MMS requires the lessee to await written permission from the MMS before taking a credit on future royalty payments.

B. *The MMS audit of OCSLA royalty payments*

The 1982, Congress directed the MMS to conduct audits of royalty payment records on federal and Indian leases.[6] The MMS conducted the audits and determined that plaintiffs owed potentially millions of dollars to the government for underpaid OCSLA royalties.

Under the MMS audit procedures, if a systemic deficiency is discovered that may affect a variety of royalty payments, the MMS notifies the payor. Unless the payor demonstrates that the MMS was in error, MMS will issue an order to recalculate and pay royalties the audit determined to be due. In this case, the MMS followed its audit procedures and issued "recalculate-and-pay" orders to plaintiffs. Plaintiffs refused to recalculate their past royalty payments and challenged the MMS orders, claiming, among other things, that the government was time barred from recovering the past due royalty payments by the statute of limitations in 28 U.S.C.A. § 2415(a) (1994).[7] The challenges to the MMS's collection of the past due royalties is the subject of litigation in various fora.[8]

To prevent the potential loss of past-due royalties by time bar, the MMS began withholding written permission for plaintiffs' royalty overpayment credits, in case offset of those credits becomes the only avenue to collect plaintiffs' past due royalties. Offset is

5. If Congress is not in session or has adjourned prior to the expiration of the thirty days, then another thirty day period will begin at the opening day of the next succeeding session of Congress. 43 U.S.C.A. § 1339(b).

6. Congress directed these audits in the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C.A. §§ 1701–57 (1986 & West Supp.1995) ("FOGRMA").

7. 28 U.S.C.A. § 2415(a) states in relevant part: [E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express

or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later.

8. All claims that the MMS now makes against the plaintiffs for unpaid royalties calculated under FOGRMA are the subject of administrative or judicial appeal. Plaintiffs have raised the statute of limitations defense for all claims.

the right of a creditor to use money it owes to a debtor to satisfy the debt owed to it. *See infra* Section III(B). Plaintiffs claim that this practice of withholding credits for future offset is unlawful. As a result, plaintiffs ask this court to compel the MMS to allow plaintiffs to take those credits now, rather than allow the MMS to withhold them pending the resolution of the plaintiffs' defenses to the MMS's claims for past royalties.

## II.

### LEGAL STANDARD

▮ Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

## III.

### ANALYSIS

#### A. *The requirements of the OCSLA*

Plaintiffs ask the court to enter a declaratory judgment that, under section 10 of the OCSLA, (1) the defendants cannot require the plaintiffs to await written permission from the MMS before taking credits on overpaid royalties, (2) the statute prohibits the MMS from claiming an administrative offset once it has reported the overpayment to Congress, and (3) the defendants must diligently process requests for refunds or credits. Because the court finds that the statute

places no such requirements on the MMS, the requested relief will be denied.

#### 1. *Written permission a valid requirement*

▮ The first issue before the court is whether under section 10 of the OCSLA, the MMS can require a royalty payor to await written permission from the MMS before taking a credit toward future royalty payments. Plaintiffs argue that the OCSLA does not require royalty payors to await written permission from the MMS to take the credits. Indeed, the OCSLA imposes no express requirement of the MMS's written permission to take credits. But, when a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

Section 10 of the OCSLA is ambiguous on whether the same procedures are used to take credits toward future royalty payments as are used to refund overpayment. Although the OCSLA explicitly requires the expiration of the congressional report-and-wait period for refund or credit, no specific reference is made to the procedures the MMS and the DOI should use to convey the refunds or credits, or whether the same procedures should be followed for both manners of repayment. Because of the statute's silence as to procedures for allowing credits, the court finds that the defendants' interpretation of section 10 is permissible.

Plaintiffs argue that defendants' concession that onshore federal leases do not require a lessee to await written permission before taking a credit toward future royalty payments makes defendants' interpretation of offshore leases impermissible. However, the statutes, policies, and procedures governing onshore leases differ markedly from those governing the OCS leases at issue. The OCSLA requires authorization from both the Secretary and Congress before credits may be taken; onshore leases have no such requirement. The plaintiffs cannot point to anything that would require the

defendants to treat onshore and offshore leases similarly. The parties disagree over how long defendants' practice of requiring written authorization has been in effect, but plaintiffs concede that it has been in place for at least eight years in accordance with the MMS Oil and Gas Payor Handbook: Report of Sale and Royalty Remittance (Form MMS–2014) (September 1986) ("Payor Handbook").

## 2. *Necessity of Departmental Rules*

■ Plaintiffs argue in the alternative that if the DOI has the authority to require written permission after the congressional report-and-wait period, this requirement could only be imposed through a departmental rule. It is unclear whether plaintiffs are arguing for the necessity of a formal rule making under sections 556 and 557 of the Administrative Procedure Act, 5 U.S.C.A. §§ 556 & 557 (1977 & West Supp.1995) ("APA"), or an informal rule making under section 553 of the APA. Either argument, however, has no merit.

First, the OCSLA does not include language that requires formal rule making. The language to trigger formal rule making procedures under the APA, that rules are "required by statute to be made on the record after opportunity for an agency hearing," is well known. 5 U.S.C.A. § 553(c). The OCSLA does not contain this language, hence the statute does not require the MMS to promulgate such procedures.

Second, the APA states that even if a statute requires the informal rule making procedures of notice and comment, such procedures do not apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C.A. § 553(b)(3)(A). The DOI admits that the MMS Handbook provision is not a rule or regulation. The MMS Handbook provision at issue is an agency interpretation of section 10 of the OCSLA, that subsequently determines the agency practice for allowing royalty credits under that Act. There is no basis for requiring an agency rule, formal or informal, to accompany the general procedure in the MMS Payor Handbook. If plaintiffs' argument were valid, every agency statutory interpretation and procedural practice would require an agency rule making; the APA expressly counsels against such measures.

## 3. *The duty to issue refunds or credits after congressional approval*

■ Plaintiffs argue that the MMS has a ministerial duty to issue a credit or refund to royalty payors once its report has been before Congress for the required time. In other words, plaintiffs claim that their royalty credits cannot be withheld for possible offset under section 10 of the OCSLA because the statute does not give the MMS this authority. This argument has some merit because section 10 of the OCSLA states that once the congressional report-and-wait period has passed, and the Secretary is satisfied that a royalty payment exceeded the amount lawfully required, "such excess shall be repaid without interest." 43 U.S.C. § 1339(a).

Defendants counter that there is nothing in the OCSLA, either express or implied, that would extinguish the government's common law right to offset. As the discussion below indicates, the court finds that a common law right of offset exists and enables the MMS to withhold funds for potential offset. *See* Section III(B). Nothing in section 10 of the OCSLA expresses an intent to abrogate the government's common law and statutory right to offset. Lacking such express intent, the court is unwilling to take Congress' silence on the issue of offset in section 10 of the OCSLA as an implied reversal of this established right. *See United States v. Texas,* 507 U.S. 529, ––– – –––, 113 S.Ct. 1631, 1634–36, 123 L.Ed.2d 245 (1993); *see also* Section III(B)(1). Therefore, in light of the MMS's common law right of offset, the court finds that nothing in the OCSLA invalidates the MMS's procedures or requires an immediate credit allowance when such an allowance would undermine the MMS's right to offset.

## B. *Withholding royalty credits for potential offset*

After determining that the OCSLA does not preclude the MMS from withholding overpaid royalties for potential offset, the

court next addresses the validity of withholding the overpayment for potential offset under the Debt Collection Act, the common law right of offset, and the Constitution.

### 1. *The Debt Collection Act*

■ The Debt Collection Act of 1982, 31 U.S.C.A. § 3716 (1983) ("DCA"), provides a procedure by which an agency of the government can collect a debt by administrative offset.[9] This statutory offset also provides, as plaintiffs point out, procedural steps that the government must take prior to offsetting a debt in order to safeguard the rights of the debtor. Offsets taken pursuant to the common law do not give debtors such procedural rights. *See* Section III(B)(2). The parties agree that the MMS has not provided these procedures to the plaintiffs. As a result, plaintiffs seek a declaratory judgment that the DCA supersedes any common law offset rights that the MMS may have, thus entitling plaintiffs to a return of their overpayment that the MMS has withheld in violation of the DCA. Defendants, on the other hand, maintain that the DCA creates offset rights in addition to the common law right of offset. In this way, defendants argue that the DCA provides a distinct and unrelated opportunity for offset, rather than the exclusive one.

■ This court must decide the question of whether the DCA provisions regarding administrative offset abrogate the government's common law right " 'to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due him.' " *United States v. Munsey Trust, Co.*, 332 U.S. 234, 239, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (*quoting Gratiot v. United States*, 40 U.S. (15 Pet.) 336, 10 L.Ed. 759 (1841)). Both parties argue that the Supreme Court's decision in *United States v.*

*Texas*, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), compels a ruling in their respective favor. In light of *United States v. Texas*, the court now holds that the DCA does not abrogate the common law right of offset, but rather it supplements it to the extent that it provides for an administrative offset in addition to the common law right.

■ The Supreme Court noted in *United States v. Texas* that "longstanding is the principle that '[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.' " 507 U.S. at ——, 113 S.Ct. at 1634 (*quoting Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)). "In order to abrogate a common law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.* 507 U.S. at ——, 113 S.Ct. at 1634 (*quoting Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978)). Moreover, the Court reiterated that courts may " 'take it as a given that Congress has legislated with an expectation that the [common law] principle will apply ...' " unless the purpose of the statute is to the contrary. *Id.* 507 U.S. at ——, 113 S.Ct. at 1635 (*quoting Astoria Federal Savings & Loan Assn. v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 2170, 115 L.Ed.2d 96 (1991)).

In the case of *United States v. Texas*, the Supreme Court held that the DCA did not abrogate the common law rule that allowed the federal government to collect prejudgment interest from the states. The DCA, although specifically prescribing annual interest rates for individuals, said nothing

---

9. The Act provides:
 (a) After trying to collect a claim from a person under section 3711(a) of this title, the head of an executive or legislative agency may collect the claim by administrative offset. The head of an agency may collect by administrative offset only after giving the debtor—
 (1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;

 (2) an opportunity to inspect and copy the records of the agency related to the claim;
 (3) an opportunity for review within the agency of the decision of the agency related to the claim; and
 (4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim.
 31 U.S.C.A. § 3716.

about prejudgment interest levied against the states. Texas argued that because the statute was silent as to whether the government could collect interest against states, the DCA abrogated the common law rule allowing for the collection of interest. First, the Court found that the purpose of the DCA was to increase the efficiency of government-wide efforts to collect debts owed to the United States. *United States v. Texas*, 507 U.S. at ——, 113 S.Ct. at 1636 (*citing* 96 Stat. 1749; S.Rep. No. 97–378, at 2 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3377, 3378.). "This suggests that Congress passed the [DCA] in order to strengthen the Government's hand in collecting its debts." *Id.* The Court then held that although the statute only provided the interest rates for individuals, its silence as to interest against states did not abrogate the common law rule allowing the collection of prejudgment interest from states. *Id.* at ——, 113 S.Ct. at 1635.[10] The court noted that Texas' reading of the DCA would decrease the incentive for states to pay their debts, frustrating the purpose of the Act.

10. "'Congress's mere refusal to legislate with respect to the prejudgment interest obligations of state and local governments falls far short of an expression of legislative intent to supplant the existing common law in that area.'" 507 U.S. at ——, 113 S.Ct. at 1634 (*quoting* Brief for Petitioners at 16).

11. Additionally, plaintiffs argue that the position taken by the MMS in this litigation contradicts a 1978 Office of Legal Counsel memorandum opinion on the "Effect of Statute of Limitations on Administrative Collection of United States Claims" ("1978 OLC Opinion"). This opinion, drafted prior to the enactment of the DCA, concluded that administrative offset is inappropriate for the collection of time barred debts. Plaintiffs contend that in 1982, when Congress enacted the DCA, it recognized the validity of the 1978 OLC Opinion by creating an exception to that rule, 28 U.S.C.A. § 2415(i). Section 2415(i) allows the government to collect a time barred debt "in accordance with [the DCA]." 28 U.S.C.A. § 2415(i). In this way, plaintiffs argue that the 1978 OLC Opinion is still in force and prohibits the MMS from offsetting time barred debts by any method other than compliance with the DCA. However, the court concludes that the MMS is not bound by the 1978 OLC Opinion, and it may, as discussed in Section III(B)(2), withhold the plaintiffs' recent overpayment pending the resolution of plaintiffs' statute of limitations defense.

Plaintiffs argue that the DCA delineates new procedures that the MMS must follow before taking an administrative offset. In other words, plaintiffs contend that the DCA abrogates the common law of offset to the extent of its coverage, that is, adding additional procedural safeguards to protect debtors. Plaintiffs distinguish the holding in *United States v. Texas* by stating that, unlike prejudgment interest where the DCA contained no provisions regarding states, with respect to offset, the DCA describes clear procedures that the government must follow before taking an offset. However, plaintiffs' arguments have no foundation in the statute itself, and, if accepted, would frustrate what the Supreme Court found to be the very purpose of the DCA.[11]

▉ Applying these principles to the right of offset, this court notes first that the statute itself does not purport to abrogate the common law right of offset. Nothing in the language of the DCA claims to replace the common law right of offset, nor does it profess to be the sole method of taking an

This court is not bound by the 1978 OLC Opinion. Furthermore, the legislative history of 28 U.S.C.A. § 2415 (establishing the six year statute of limitations) shows that Congress did not intend to affect an agency's ability to offset claims.

> The bill will not affect the authority of each agency to offset, on its own books and without resort to the court, any claim it may have against a person to whom it is about to make a payment based on the same or an unrelated transaction. For example, under 31 U.S.C. 71a, 237, a claimant has ten full years to present to the General Accounting Office a claim against the United States. We do not intend any diminution of that agency's authority to offset against a claim so presented any debt, however old, such claimant owes to the United States.

Statement of John W. Douglas, Assistant Attorney General, Before Subcommittee No. 2, Committee on the Judiciary, House of Representatives, on H.R. 13652 (1966) at 6–7. Also, Congress' passage of 28 U.S.C.A. § 2415(i) indicates its disagreement with the OLC that offset is not possible for time barred debts. Finally, in light of this court's analysis of the common law right of offset in Section III(B)(2), the court concludes that plaintiffs' argument that the 1978 OLC Opinion requires the conclusion that common law offset is not available to the MMS must fail. The right does exist and indeed the court finds that the MMS's actions are permissible.

offset. Moreover, as the Supreme Court determined, the purpose of the DCA is to increase the government's efficiency in collecting its debts. *United States v. Texas*, 507 U.S. at ——, 113 S.Ct. at 1636. Certainly providing an additional opportunity for offset, as opposed to replacing the existing common law rules of offset with a more onerous one, satisfies this purpose. Furthermore, the court finds persuasive the Federal Circuit's finding in *Cecile Industries, Inc. v. Cheney* that the DCA expands the use of offset beyond what is already permitted. 995 F.2d 1052, 1055 (Fed.Cir.1993). The court in *Cecile Industries* held that the DCA does not abrogate the government's common law right to offset contractual debts. *Id.* at 1055–56.[12] That court further found that "the language of the 1982 Act illustrates that an administrative offset under section 3716 is a last resort which an agency 'may' use 'after' other collection efforts fail." *Id.* (*citing* S.Rep. No. 378 at 12, 1982 U.S.C.C.A.N. at 3388). *Cecile Industries* held, as this court does now, that the procedures of the DCA cannot be construed to limit offset rights that the government enjoys under the common law.[13] *See also McCall Stock Farms, Inc. v. United States*, 14 F.3d 1562, 1566 (Fed.Cir.1993) (concluding that the DCA does not abrogate the common law alter ego doctrine as a method of implementing an administrative offset).[14]

Consequently, the court concludes that the DCA does not abrogate the MMS's common law right of offset. The better reading of the DCA is that its offset provision provides an additional opportunity for offset. Reading the DCA in this manner fulfills the purpose of the Act and comports with the Supreme Court's holding in *United States v. Texas*.

### 2. The Common Law Right of Offset

■ After finding, as the court has, that the DCA does not supplant any common law right of offset, the plaintiffs next argue that, in any event, the MMS has unlawfully exceeded that right. Conceding that a common law right to offset exists, plaintiffs contend that whatever those rights may be, the defendants have gone beyond them by withholding plaintiffs' money on debts that plaintiffs claim are unliquidated, unmatured, and contingent. Accordingly, plaintiffs seek a declaratory judgment that defendants' actions are contrary to their common law offset rights.

■ The government, as with every creditor, has the right "'to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (*quoting Gratiot v. United States*, 40 U.S. (15 Pet.) 336, 10 L.Ed. 759 (1841)). This right extends to, for example, the right to withhold money owed a party on a contract because of money due on another, unrelated contract with the same party. *See Tatelbaum v. United States*, 10 Cl.Ct. 207 (1986).

■ Offset rights also extend to the collection of debts otherwise barred by a statute of limitations. Although the expiration of the statute of limitations may bar a direct action

---

**12.** "Thus, the enacted purpose of the Act underscores that it does not apply to restrict the common law doctrines governing contractual offsets." *Id.* at 1055.

**13.** Plaintiffs argue for a more restrictive reading of *Cecile Industries*. Plaintiffs would limit the holding to debts and claims arising under the Contract Disputes Act of 1978. However, the court does not agree that *Cecile Industries* is so limited. Although the case arose in the context of the Contract Disputes Act, the Federal Circuit analyzed the DCA and its impact on the common law right of offset against a claim by a debtor that the DCA applied to abrogate the government's common law right to intercontractual offset. *Cecile Indus.*, 995 F.2d at 1054. The court's

conclusion about the impact of the DCA was reinforced by the Contract Disputes Act; however, that Act did not limit the abrogation analysis.

**14.** Plaintiffs cite to *McWane Coal Co., Inc.*, 95 I.B.L.A. 1 (1986) to show that the DOI has taken the position that the DCA is the exclusive offset remedy. Plaintiffs believe that the finding in *McWane* that the DOI's Departmental Manual complied with the DCA necessarily implies a finding that the DCA is the only way the DOI may offset debts. This court refuses to impute such meaning into this administrative opinion. The opinion only confirms that, in that case, the procedure complied with the DCA. No conclusion was drawn that the DCA is the exclusive offset method.

by the government, "it does not bar the government from invoking its administrative remedies to offset the indebtedness against other claims by the debtor." *Doko Farms v. United States,* 956 F.2d 1136, 1140 (Fed.Cir. 1992) (*citing Thomas v. Bennett,* 856 F.2d 1165, 1169 (8th Cir.1988)); *see also Atwater v. Roudebush,* 452 F.Supp. 622, 632 (N.D.Ill. 1976) ("The time honored rule has been that a statute of limitations bars the remedy and does not extinguish the liability.").

In response to the numerous claims by the MMS against the plaintiffs for past royalties, plaintiffs have all asserted, among others, the defense that the defendants' direct actions for the collection of these debts are barred by the applicable statute of limitations, 28 U.S.C. § 2415(a).[15] In response to the plaintiffs' statute of limitations defense, the MMS refused to allow plaintiffs to take credits on recent royalty overpayment. By withholding the funds, the MMS could, if courts validate the statute of limitations defense, eventually offset the debts. However, the plaintiffs contend that the MMS's withholding of plaintiffs' overpayment for potential offset exceeds the MMS's common law rights. Plaintiffs argue that defendants cannot take an administrative offset of the withheld royalty overpayment unless they can establish that the debts are due and liquidated at this time, the time of the offset. In other words, plaintiffs assert that defendants cannot offset debts that do not necessarily exist at the time of the offset.[16]

This court must now address an issue that other courts have not squarely faced: May the MMS temporarily withhold plaintiffs' recent royalty overpayment pending the resolution of the MMS's claims against the plaintiffs on the same leases so that the overpayment will be available to satisfy the prior debts? The court answers this question in the affirmative. The plaintiffs fail to make the distinction that at this time, the MMS has not taken any offset, administrative or judicial.[17] Indeed, for the reasons set out below, the court finds that the MMS is entitled to withhold the overpayment pending the resolution of all its claims against the various plaintiffs in order to preserve its right to offset debts owed by plaintiffs on the very leases that plaintiffs now claim to be entitled to overpayment.

Plaintiffs allege that because the MMS does not dispute that plaintiffs overpaid recent royalties, and because plaintiffs do dispute that they owe prior, unpaid royalties to the MMS, plaintiffs are entitled to immediately take the credits pending the resolution of the MMS's claims for unpaid royalties. This position is flawed. The case of *Doko Farms v. United States,* 956 F.2d 1136 (Fed. Cir.1992), illustrates the problem with the plaintiffs' argument. The plaintiff Doko Farms applied for and received subsidies in 1972 and 1973 under the Upland Cotton Price Support Program. Several years later, the Department of Agriculture determined that Doko had fraudulently inflated the

15. As noted earlier, plaintiffs have disputed all claims by the MMS for unpaid royalties assessed pursuant to FOGRMA. All claims are the subject of administrative or judicial proceedings.

The parties seem to agree that the defendants' claims against the various plaintiffs fall into one of three categories: (1) cases in which the only defense asserted is that the government's claims are time barred; (2) claims in which the government has ordered plaintiffs to conduct a "self-audit" and pay the amounts owing, and the plaintiffs also raise the statute of limitations defense; and (3) cases where plaintiffs challenge the merits of the past-due royalty claims as well as assert the statute of limitations defense.

16. Plaintiffs cite numerous cases for the proposition that debts must be liquidated before an offset can be taken. *See, e.g., Montello Oil Corp. v. Apex Oil Co.,* 571 F.Supp. 389, 392 (E.D.Mo. 1983) (requiring liquidated debts for offset under

Missouri law); *Phelps Dodge Indus. v. Piedmont Electric Supply Corp.,* 523 F.Supp. 201, 202 (W.D.Va.1981) (requiring liquidated debts for offset under Virginia law). Plaintiffs also cite cases to show that the MMS cannot offset contingent or unmatured claims. *See, e.g., Grant County Savings & Loan Ass'n v. Resolution Trust Corp.,* 770 F.Supp. 1374, 1377 (E.D.Ark.1991) (requiring non-contingent debts for offset under Arkansas law); *Resolution Trust Corp. v. United Trust Fund, Inc.,* 775 F.Supp. 1465, 1470 (S.D.Fla. 1991) (requiring a matured debt for offset under Florida law).

17. Defendants assert the right to take both an administrative or common law right of offset as well as a judicial offset under 28 U.S.C. § 2415(f). However, in light of the court's conclusion that the MMS has not taken an offset, the court need not reach the issue of which offset would be appropriate.

14

amount of subsidy that it was entitled to. The government demanded that Doko refund the excess. When Doko refused, the government withheld subsides it owed Doko for later years and sued to recover the amount. Doko disputed the government's claim, asserted the statute of limitations defense, and demanded the payment of the withheld subsidies. 956 F.2d at 1138. Even though the Department did not dispute that it owed later subsidy funds to Doko, the Department held those funds pending the resolution of its other claims against Doko. Throughout the litigation over the 1972 and 1973 subsidy amounts, the Department of Agriculture had not yet taken an offset; it held the funds for a potential offset if the court found that the statute of limitations barred a direct action against Doko.

Similarly, in *Tatelbaum v. United States*, the government retained money admittedly owing to a bankrupt construction company for potential offset of reprocurement costs that it would incur as a result of the bankruptcy. 10 Cl.Ct. 207 (1986). The construction company had four separate contracts with the government. After it had completed two and partially completed the others, the company filed for bankruptcy. At that time, the government owed money to the company for work performed. One year later, the government attempted to administratively offset the money it owed the bankrupt for work completed under the contracts with the reprocurement costs that the government incurred on the partially completed contracts. 10 Cl.Ct. at 208–09. The trustee for the bankrupt company challenged the offset by claiming that because the reprocurement costs were unliquidated at the time the company filed for bankruptcy, offset one year later was improper.

The court rejected this argument and allowed the offset, holding that the construction company's "liability accrued in spite of the fact that actual reprocurement did not take place until later and only then were the

actual reprocurement amounts known." *Id.* at 211. The court also stated that

breaches of contracts with the United States created liability for reprocurement costs at the time of the breach. Thus, the fact that the United States could not ascertain the exact amount of its claim for reprocurement costs from [the company] until later is and was irrelevant.

*Id.* Here, as in *Doko Farms*, the government withheld the recent overpayment pending the resolution of debts that arose, if at all, at an earlier time. Accordingly, in this case, the debts of plaintiffs to the MMS arose, if at all, at the time of the alleged underpayment of royalties.

The MMS asserts that each plaintiff owes unpaid royalties stemming from underpayments prior to 1982. The plaintiffs begin by defending these claims on the ground that they are time barred. Additionally, plaintiffs challenge the merits of some of the government's claims. The parties are litigating these claims in various administrative and judicial fora. Eventually, the courts will definitively resolve the statute of limitations question as well as all other disputes over the debts allegedly owing to the government. In the event that the statute of limitations question is resolved against the MMS,[18] once all remaining disputes about the merits of the MMS's claims are resolved, the MMS will be entitled to offset any debt that is valid but time barred with the withheld overpayment. If the court were now to order the repayment of the withheld funds, no offset would be possible. Also, under the *Doko Farms* and *Tatelbaum* rationale, the plaintiffs' debts, if any, arose prior to 1982; therefore, although the amount may be disputed, the events giving rise to the debt have already occurred.

It would seem illogical for the court to order the return of the overpayment while the parties litigate the debt owed to the MMS. As acknowledged by the plaintiffs, some debts are undisputed. The fact that plaintiffs contest the others as to validity or

18. The plaintiffs argue that this court's decision in *Samedan Oil Corp. v. Deer*, No. 94–2123, 1995 WL 431307 (June 14, 1995), which held that the statute of limitations does not bar the collection of unpaid royalties, means that the MMS's withholding of plaintiffs' overpayment is "utterly without foundation." This position is untenable. The case is currently on appeal. Moreover, not all plaintiffs in this action were party to that case.

amount cannot entitle plaintiffs to the immediate return of their funds. It may be that the MMS cannot offset the debts until they are liquidated and mature; however, at this point, the MMS has not yet offset any debts.

■ This is not a case of allowing the MMS to withhold funds indefinitely in the event that a debt should arise in the future. The MMS asserts that the plaintiffs owe for unpaid royalties. The MMS sued to enforce the debts. Certainly plaintiffs cannot contend that by simply "challenging" the merits of the MMS's claims, it can subvert the MMS's right to offset. This holding allows the MMS to withhold funds in anticipation of the resolution of debts in which (1) the events giving rise to the liability for a potential debt have already occurred, and (2) the MMS has asserted its claim of debts owing. The court finds that to hold otherwise, that is, to allow a potential debtor to receive funds owing to it simply by contesting the "merits" of the government's claim that a debt exists, would undermine the very purpose of the offset device.[19]

### 3. *Due Process*

■ Finally, plaintiffs argue that the MMS's temporary withholding of their royalty overpayment pending the resolution of the statute of limitations issue amounts to a denial of their right to procedural due process under the Fifth Amendment. Plaintiffs seek a declaratory judgment that defendants' actions are arbitrary and capricious in violation of plaintiffs' right to due process.

■ In this circuit, as in all others, procedural due process is a two step inquiry: First, have the plaintiffs "asserted a property

interest encompassed within the protection of the due process clause," and second, if plaintiffs have a protected property interest, what process is due? *See Propert v. District of Columbia,* 948 F.2d 1327, 1331 (D.C.Cir.1991) (*citing Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)). On the issue of whether plaintiffs have asserted an interest in property protected by the due process clause, plaintiffs flatly assert that they have a protected property interest in the overpayment made to the MMS under a district court's holding in *Marcello v. Regan,* 574 F.Supp. 586, 595 (D.R.I. 1983) (finding a property interest in an individual's tax refund appropriated to satisfy delinquent child support payments). Defendants dispute that plaintiffs have a recognizable property interest in the overpayment that is subject to offset on debts owing under the same leases.

■ "To have a constitutionally protected property interest, a person must have a 'legitimate claim of entitlement.'" *Rogers v. Bucks County Domestic Relations Section,* 959 F.2d 1268, 1274 (3d Cir.1992) (*quoting Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). In order to analyze whether plaintiffs' have a sufficient property interest, the court must first carefully delineate what plaintiffs have lost. The MMS has temporarily refused to give the plaintiffs written permission to apply recent overpaid royalties toward future royalty payments. The MMS has not permanently deprived the plaintiffs of the credits because it has not yet offset the previous debts with the overpayment. Thus, the only right involved is what

---

**19.** Curiously, plaintiffs also argue that the offset device is not available to the defendants to offset debts owing on leases located on Indian lands. The legal principle upon which plaintiffs rely is that in order to use the device of offset, the claims must involve mutual debts and credits. *See Modern Settings, Inc. v. Prudential–Bache Securities, Inc.,* 936 F.2d 640, 648 (2d Cir.1991) ("Mutual debts are 'due to and from the same person.'"). Plaintiffs claim that the defendants cannot offset debts owed by plaintiffs to third parties with money that defendants themselves owe to the plaintiffs. In other words, plaintiffs argue that debts owed to Indians are not in mutuality with debts owed by the United States.

The answer to plaintiffs' contention is that the MMS administers leases on Indian allotted lands and Indian tribal lands under 25 U.S.C.A. § 396 and 25 U.S.C.A. § 396a–396g. In this sense, the MMS stands in the place of the Indians regarding the administration of the leases. It make little sense to argue that the MMS is required to collect the royalties and conduct judicial litigation on their behalf, but deny the MMS the ability to offset debts owed on the leases with overpayment on the leases. Because of the statutory relationship and duties placed on the MMS, the court finds that the plaintiffs' mutuality argument fails as a matter of law.

plaintiffs claim as their undisputed right to immediately apply the recent overpayment toward future bills. However, plaintiffs mistakenly argue that the overpaid sum is their property because they erroneously view each lease payment as an isolated transaction. Consequently, when the nature of the ongoing relationship between the MMS and the plaintiffs is properly identified, at least at this time, plaintiffs have no recognizable property interest in the overpaid funds.

Pending the resolution of prior debts, plaintiffs have no property interest in overpaid royalties to the extent of the alleged prior debts. The MMS's determination that plaintiffs have overpaid recent royalties did not create an immediate entitlement to those funds that would implicate the Due Process Clause. The court finds that the plaintiffs are not entitled to the overpayment until prior debts have been resolved because it views the transactions between the plaintiffs and defendants as a continuing, ongoing transaction. Once the prior debts have been finally resolved, the overpayment can be applied to satisfy the debts and, at that point, plaintiffs will be entitled to any remaining funds.

The critical flaw in plaintiffs' argument that they have an immediate entitlement to the recent overpayment is that it assumes that once the MMS established that the plaintiffs have made recent overpayment, they automatically acquire property rights in the excess funds (or perhaps the plaintiffs never lost the property rights in their money). Yet this assumption ignores the fact that plaintiffs may owe at least that much in unpaid royalties from prior years. An example will help illustrate the problem. If, for example, plaintiffs overpaid by one million dollars in 1993, but still owed two million dollars in unpaid royalties from 1992, plaintiffs could not claim that they have a property right in the one million dollars. The only way plaintiffs could claim rights in the one

million dollars would be to artificially separate 1992's debt from 1993's overpayment. However, all of the debts owed stem from the same leases. The nature of the MMS' relationship with the plaintiffs is an ongoing, continuous one. As such, the court will view the transactions between plaintiffs and the MMS as a whole. If plaintiffs owe a sum from previous years' underpayment, plaintiffs cannot claim to be entitled to the recent overpayment. Plaintiffs have already received benefits from the leases in the previous years without compensating the MMS; therefore, plaintiffs have no right to overpaid amounts on the same leases because plaintiffs cannot overpay until the prior debts have been satisfied.[20]

Plaintiffs claim that courts have recognized a property interest in money held by the government, but owing to a party. *See, e.g., Marcello,* 574 F.Supp. at 595 (tax refunds); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969) (wages); *Toney v. Burris,* 650 F.Supp. 1227, 1234 (N.D.Ill.1986) (wages). Plaintiffs argue that, as with a tax refund, the MMS has determined that plaintiffs have overpaid their royalties, thus establishing an entitlement or recognizing an existing property interest in the funds.

Indeed as the cases cited by the plaintiffs show, before the government can appropriate money owing to a party and apply it to another, unrelated debt, the government must give the party process. *See, e.g., Marcello,* 574 F.Supp. at 595. However, in this case, the MMS is not seeking to appropriate the overpayment in order to apply them to another, unrelated debt. The prior debts are directly related to the overpaid funds and are all part of the same, continuing transaction. Moreover, unlike

---

**20.** That the prior debts are, in some cases, disputed by the plaintiffs does not change the analysis. Part of the process due the plaintiffs with respect to the MMS's claims of prior, unpaid royalties, is an opportunity to challenge the MMS's claims before the royalties are collected. Plaintiffs vigorously challenge all claims as time barred, and plaintiffs in many cases challenge the merits of the claims. Plaintiffs, however, cannot claim that the delay in determining the precise amount of unpaid royalties because of their appeals negates the MMS's ability to hold the recent overpayment in order to satisfy the debts. As the court has discussed, plaintiffs are not entitled to the recent overpayment until the prior debts on the same leases are satisfied.

wages duly earned or a tax refund that the IRS has finally determined a party is entitled to receive, the MMS is still in the process of determining the amount of payment owed by the plaintiffs for prior years. Until all prior debts are finally resolved and satisfied, plaintiffs cannot be said to have rights in the temporarily withheld credits.[21]

Because the court views the recent overpaid royalties as part of the same, continuing transaction as the prior, unpaid royalty debts, cases such as *North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), do not apply. In *North Georgia Finishing, Inc.*, the Supreme Court struck down a Georgia garnishment statute that allowed any plaintiff in a pending suit to garnish the defendant's assets based solely upon a sworn affidavit with conclusory allegations as to the defendant's liability to the plaintiff. 419 U.S. at 603, 95 S.Ct. at 721. The Court held that even the temporary garnishment of defendant's bank account implicated a property right protected by the due process clause. *Id.* at 606, 95 S.Ct. at 722. "That the debtor was deprived of only the use and possession of the property, and perhaps only temporarily, did not put the seizure beyond scrutiny under the Due Process Clause." *Id.* Unlike the overpayment at issue in this case, the parties could not dispute that the defendant's bank account was his property. The plaintiff in *North Georgia Finishing, Inc.* attempted to appropriate defendant's property and ap-

ply it to satisfy another, unrelated debt. Such is not the case here. The MMS holds the recent overpayment in order to apply it to satisfy prior, unsatisfied debts on the same leases.

In light of the court's determination that the MMS's decision to temporarily refuse to allow plaintiffs to credit the recent overpayment pending the resolution of prior underpayment does not implicate plaintiffs' property rights, the court does not reach the second step of the due process inquiry.

## C. *The preliminary injunction*

In light of the court's holding on the merits of plaintiffs' constitutional and statutory claims, plaintiffs' renewed motion for a preliminary injunction will be denied as moot.

SO ORDERED.

21. The court does not disregard the Supreme Court's increasingly expansive view of protected property interests. The cases upon which the plaintiffs rely do not address the situation of an ongoing, continuous contractual relationship where overpayment is made on leases that have debts currently owing. *See, e.g., Toney,* 650 F.Supp. at 1234 (attempting to appropriate wages earned by a state employee to satisfy unpaid student loans); *Marcello,* 574 F.Supp. at 595 (attempting to appropriate a tax refund to satisfy delinquent spousal and child support payments); *N.L.R.B. v. E.D.P. Medical Computer Systems, Inc.,* 6 F.3d 951, 953–56 (2d Cir.1993) (finding a property interest in the NLRB's garnishment of money for back wages owed to E.D.P. by a separate corporation for unrelated matters). In these cases, it is undisputed that the government owes the money to the party; the government attempted to apply that money to an unrelated debt. Unlike the situations in the plaintiffs' cases, not only are the same parties involved, but also the debts arise out of the same leases as the overpayment. Although defendants do not dispute that plaintiffs overpaid the recent royalties, they contend that plaintiffs owe prior, unpaid royalties on the same leases. Accordingly, plaintiffs have no property interest in the withheld overpayment pending the resolution of the prior debts. *Cf. Winzeler Excavating Co. v. Brock,* 694 F.Supp. 362, 366 (N.D.Ohio 1988) (refusing to find a property interest in the uninterrupted flow of payments on a government contract when the government withheld the payments in order to apply the money to the underpaid wages of the people who worked on that contract); *accord G & H Machinery Co. v. Donovan,* 96 Lab. Cas. (CCH) ¶ 34,354, 1982 WL 2054 (S.D.Ill.1982) (finding no property interest in the uninterrupted transmittal of payments under a contract when payments withheld to cover underpaid wages of the people who worked on that contract). *Contra Ames Const. Co. v. Dole,* 727 F.Supp. 502, 506 (D.Minn.1989).